**BETTEROADS ASPHALT CORPO-RATION, Plaintiff,**

v.

**FEDERACIÓN de CAMIONEROS de PUERTO RICO, INC. et al., Defendants.**

**Civ. No. 75-275.**

United States District Court,
D. Puerto Rico.

April 22, 1975.

Luis E. Dubon, Dubon and Dubon, San Juan, P. R., for plaintiff.

R. Brignoni-Navarro, Carolina, P. R., for defendant.

## DECISION AND ORDER

TORRUELLA, District Judge.

This is a private party suit seeking injunctive relief and damages under the provisions of the Sherman Anti-Trust Act, 15 U.S.C. § 1 et seq. A temporary restraining order without notice was requested and granted on March 26, 1975. Thereafter, on April 2, 1975 a hearing was held to determine whether a preliminary injunction should issue. Both parties appeared and presented evidence in support of their respective positions.

Plaintiff is a corporation organized under the Laws of the Commonwealth of Puerto Rico and with its principal place of business therein. It is engaged in the manufacture of asphalt concrete which is used for the surfacing of roads and highways in Puerto Rico. Plaintiff owns and operates four hot plants: Plant No. 1 in the Ward of Cupey, Río Piedras, P.R., Plant No. 2 in the Ward of Cerro Gordo, Aguada, P.R., Plant No. 6 in State Road No. 10, Arecibo, P.R., and Plant No. 3 in the Ward of Hato Tejas, Bayamon, P.R. Plaintiff is the largest manufacturer of asphalt concrete in Puerto Rico with an annual dollar volume of approximately $10–12,000,000.

Last year it manufactured 575,000 tons out of a total 1,300,000 tons produced locally.

Plaintiff has a capital investment of approximately $12,250,000 with a weekly payroll of $30,000–40,000 for about 215 direct employees.[1] Substantially all of the equipment used by Plaintiff is manufactured and imported from outside of Puerto Rico.

Of the components that make up the finished product manufactured by Plaintiff, which consist mainly of crushed rock-sand aggregates and liquid asphalt, the aggregates are purchased from local quarries and the asphalt is a petroleum byproduct manufactured by Gulf Oil Co., and Commonwealth Oil Refining Company here in Puerto Rico.[2]

Defendant Federación de Camioneros de Puerto Rico, Inc., herein referred to as Defendant Federación, is a non-profit association of truck owners, engaged in the public transportation business throughout Puerto Rico. Defendant Federación de Camiones de Volteo del Oeste, Inc., herein referred to as Defendant Federación del Oeste, is also a non-profit association of truck owners engaged in the public transportation business in Western Puerto Rico, and is an affiliate member of Defendant Federación. Both Defendant Federación and its affiliate, Defendant Federación del Oeste, admit individual truck owners to membership. The named Defendants, other than these two Federations, are individual members, officers, agents, and directors of these Defendant organizations.

We must decide the first of two jurisdictional hurdles which must be crossed by Plaintiff: whether Plaintiff meets the interstate commerce requirements of the Sherman Act.

■ It is clear that in enacting the Sherman Act, Congress exercised its full power over interstate commerce so that it extends not only to transactions which are directly in the stream of commerce, but also to business activities which are closely and substantially related to interstate traffic. United States v. Southeastern Underwriters Association, 322 U.S. 533, 558, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944).

■ The tests for determining whether business activity involves interstate commerce for purposes of antitrust laws are whether the activity complained of occurs within the flow of interstate commerce, or whether *the acts complained of*, while intrastate, substantially affect interstate commerce. Burke v. Ford, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967); De Voto v. Pacific Fidelity Life Insurance Company, 354 F.Supp. 874 (D.C.Cal., 1973); United States v. Pennsylvania Refuse Removal Assn., 242 F.Supp. 794 (D.C.Pa., 1965), affirmed 357 F.2d 806 (CA 3, 1966), cert. den. 384 U.S. 961, 86 S.Ct. 1588, 16 L.Ed.2d 674 (1966).

■ The acts complained of in this case consist of an alleged conspiracy by Defendants to force Plaintiff to grant Defendants the exclusive right to transport and deliver all of Plaintiff's product in Plants No. 2 and 3, and of alleged overt acts by Defendants in furtherance of this conspiracy. These acts allegedly include physically preventing Defendant from doing business with third persons with whom Plaintiff has contracted the transportation and delivery of its products. It is clear that if these acts took place, there would be substantial interference with interstate commerce as Plaintiffs product is used for the construction of instrumentalities of interstate commerce. See Overstreet v. North Shore Corp., 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656 (1943). Additionally, Plaintiff makes substantial purchase of machinery and equipment from

---

1. These employees are represented by a labor union called the Unión de Obreros de Cemento Mixto de Puerto Rico, and there exists a collective bargaining contract between this labor organization and Plaintiff. They are not in any way connected to the issues here in litigation.

2. The Court takes judicial notice that all petroleum is imported to Puerto Rico.

points outside of Puerto Rico, and one of the two main ingredients of the finished goods is a by-product of petroleum, which itself is imported *in interstate commerce*.

The second jurisdictional question relates to Defendants' allegation to the effect that the present case is a "labor dispute" within the meaning of the Norris La Guardia Act, 29 U.S.C. § 101 et seq., and that therefore this Court is without power to issue injunctive relief against Defendants unless the requirements of that statute are met by Plaintiff.

Let us look at the facts relevant to this issue. The individual Defendants are all truck owners duly licensed as public carriers by the Public Service Commission of Puerto Rico. It is undisputed, and in fact affirmatively claimed by the several witnesses, including the President of Defendant Federación del Oeste, that Defendants are independent contractors. This conclusion is further supported by the proven facts: Defendants individually own their trucks; some employ their own employees; they bear individually all the maintenance, operating and repair expenses, including gasoline, oil, tires, and insurance; they are compensated pursuant to mileage/tonnage rates established by the Public Service Commission and no deductions are made from the individual liquidations for Social Security taxes, Income Tax, etc.; they are free of any supervision in carrying out their operations, including their routes or movements.

■■■ Although it is clear that Defendants are not the employees of Plaintiff, in view of the language of Section

13(c) of the Norris-La Guardia Act,[3] said conclusion is not dispositive of this issue. In deciding whether the controversy between Plaintiff and Defendants is a "labor dispute" within the meaning of Section 13(c) we must look to the nature of the dispute between Plaintiff and Defendants to determine whether an employer-employee relationship has central bearing on this question. Columbia River Co. v. Hinton, 315 U.S. 143, 62 S. Ct. 520, 86 L.Ed. 750 (1942).

The beginnings of this controversy date back to late September or early October, 1974, when the leadership[4] of Defendant organizations visited Plaintiff's vicepresident and general manager, Ottmar Chavez. During this meeting it was requested of Plaintiff that it use only members of Defendant organizations in hauling asphalt from the No. 2 Plant. Plaintiff refused to comply with this request but afforded Defendants an opportunity of convincing the haulers that were used by Plaintiff to join their organization. Defendants apparently were unpersuasive.

The haulers used by Plaintiff at Plant No. 2 have a *modus operandi* similar to that previously described as regards the individual Defendants. These independent haulers have been doing business with Plaintiff for approximately 12 years. This group has varied in size from 22 to the present number of 15. They have formed a cooperative and deal with Plaintiff through a leader, Israel Justiniano. When Plaintiff needs hauling its contacts the leader who then supplies the necessary transportation. These independent haulers have established a voluntary procedure among themselves for the distribution of the work referred by the leader.

3. 29 U.S.C. § 113(c) reads as follows:
"The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, *regardless of whether or not the disputants stand in the proximate re-* *lation of employer and employee*." (Emphasis supplied).

4. Milton Torres, President of Defendant Federación del Oeste, R. Brignoni Navarro, legal counsel for Defendants, Victor Ríos, former President of Defendant Federación; and Rubén López Borrero, the new President of Defendant Federación.

On or about March 14, 1975 Plaintiff completed the construction of Plant No. 3. On March 18, 1975 Defendants, in support of their demand for exclusivity in hauling Plaintiff's product, picketed Plants No. 1, 2, and 3, and thereafter continued said activity until March 22, 1975. On said date they ceased picketing at all plants with the exception of Plant No. 2 where they continued said actions until the temporary restraining order issued. The picketing was accompanied by threats and intimidation and effectively prevented Plaintiff from carrying out its hauling with the independent truckers at Plant No. 2.

█ In our opinion the controversy is not one concerning "terms or conditions of employment." We are faced here with a group of independent business men attempting to take away the business of another group of independent business men,[5] and thus are dealing with non-labor groups. Allen Bradley Co. v. Union, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); Columbia River Co. v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750 (1942); American Medical Assn. v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943). The facts of the present case, as we find them, have no bearing on an employer-employee relationship, Columbia River Co. v. Hinton, supra, at page 147, 62 S. Ct. 520, and thus do not involve a labor dispute within the meaning of the Norris-La Guardia Act, supra.

Having thus decided the jurisdictional issues we must now pass upon the merits of Plaintiff's request for preliminary injunctive relief.

█ The traditional elements that have to be examined in determining the propriety of granting this request have been summarized as:

(1) The irreparable harm which will flow from the denial of the injunction;

(2) The inconvenience and substantial damages to the opposing party;

(3) The absence of an adequate remedy at law, and

(4) The likelihood that the petitioner will prevail on the merits of its petition.

Pauls v. Secretary of Air Force, 457 F. 2d 294 (CA 1, 1972); Quaker Action Group v. Hickel, 137 U.S.App.D.C. 176, 421 F.2d 1111 (1969); Nelson v. Miller, 373 F.2d 474 (CA 3, 1967).

It is clear that Plaintiff is suffering, and will continue to suffer, irreparable harm from the denial of injunctive relief. Not only does Plaintiff lack an adequate remedy at law [6] but any attempt to recover the considerable monetary losses being suffered by Plaintiff would in all probability be illusory.

On the other hand the damages, if any, that can be suffered by Defendants from Plaintiff's refusal to do business with them at Plant No. 2, can be insured against by continuance of the outstanding bond and additionally by action against Plaintiff's substantial assets.

█ Lastly, as the record presently stands, there is little doubt that Defendants, in seeking to force Plaintiff to deal exclusively with them in the hauling of their product, are restraining trade in violation of Section 2 of the

---

5. Although there is evidence on the record to the effect that the picketing is caused by the "layoff" of seven truck drivers at Plant No. 2, we are unconvinced legally or factually in this respect. In the first place, the term "layoff" implies an employer-employee relationship which does not here exist. Secondly, the seven affected truck drivers have been hauling from Plant No. 2, on a part time basis, for sometime pursuant to an agreement reached under the aegis of the Public Service Commission. Defendant Federación del Oeste's President, Milton Torres Arroyo, testified that his organization was willing to end the "protest", if Plaintiff gave the hauling to them. Thus this explanation of Defendants' actions has all the appearance of an after-thought to make apparently plausible what would otherwise be patently illegal.

6. Defendants' suggestion that Plaintiff seek the aid of the Public Service Commission is spurious.

Sherman Act, 15 U.S.C. § 2, and are likely to prevail on the merits. Los Angeles Meat Drivers v. United States, 371 U.S. 94, 83 S.Ct. 162, 9 L.Ed.2d 150 (1962).

■ Wherefore, it appearing from the above that Defendants are engaging in a restraint of trade in violation of 15 USC 2, and that Plaintiff may suffer irreparable harm and injury before this cause can be decided on the merits, it is

Ordered, that the Defendant, Federación de Camioneros de Puerto Rico, Inc., and its President, the Defendant Rubén López Borrero, and its affiliate, Federación de Camiones de Volteo del Oeste, Inc., and its President, the Defendant Milton Torres, and their respective officers, members, agents or representatives and attorneys, and each and all of the other co-defendants, and their respective agents, servants, employees and representatives and attorneys and each and every one of them, and every person acting in their assistance or conjunction, or in aid or in conjunction of or with any of them, or either of them, be and they are all hereby enjoined and restrained:

a) From in any way disrupting, obstructing, restraining, interfering, hindering or delaying the trade and business of Plaintiff, and specifically the operations of its asphaltic concrete hot plants situated in the Ward of Cupey of Río Piedras, Municipality of San Juan; the Ward of Cerro Gordo, Municipality of Aguada; Road PR–10, in the Municipality of Arecibo and in the Ward of Hato Tejas, Municipality of Bayamón; the marketing, distribution, transportation and delivery of asphaltic concrete manufactured at the said plants or any of them; and the transportation and delivery thereto of liquid petroleum asphalt, raw materials, machinery, equipment, tools and supplies or any other articles or products for use and consumption in the operation of the trade and business of Plaintiff, and of its above mentioned asphalt concrete hot plants, or in the repair, maintenance, and expansion thereof;

b) From in any way obstructing, restraining, intervening, hindering or delaying the free ingress to and egress from the offices of the Plaintiff and to and from its aforementioned asphalt concrete hot plants, of any and all persons, automobiles, carts, trucks, trailers, and any other transportation equipment, whether or not owned or operated by Plaintiff, its Directors, officers, stockholders, agents, servants, employees, representatives and whether loaded or unloaded and from in any way or manner engaging in acts of violation, intimidation, or coercion threat in an effort to obstruct, restrain, interfere, hinder and delay the free ingress and egress therefrom, and

c) From in any way boycotting, monopolizing, or obtaining or attempting to boycott, monopolize or obtain or otherwise, the exclusive right to transport and deliver in Puerto Rico the asphaltic concrete manufactured by Plaintiff at its above mentioned asphaltic concrete hot plants or any of them, and/or the transportation and delivery thereto of liquid petroleum asphalt, raw materials, machinery, equipment, tools and supplies and any other articles or products for use and consumption in the operation of the trade and business of Plaintiff and of its above mentioned asphaltic concrete hot plants or in the repair, maintenance and expansion thereof and from in any way obstructing, hindering and delaying the said transportation and delivery operations by other public or private carriers.

This preliminary injunction shall continue in full force and effect until such time as this matter is decided on the merits and provided that Plaintiff give security to be approved by the Court in the sum of $50,000.00, for the payment of such damages and costs as may be incurred by any party who is found to have been wrongfully enjoined or restrained.

It is so ordered.